JOHN GILMORE

*v.*

EPHRAIM GILMORE *et al.*

*Filed at Springfield March 26, 1884.*

1. RENTS AND PROFITS—*rights of heir as against the widow, on partition—acquiescence of the widow in a special arrangement—estoppel.* While a widow, whose husband died in 1855, might have been entitled to the exclusive use of the whole of the home farm until her dower was assigned, yet when she did not insist on such right, but has ever since 1870 acquiesced in an arrangement then made by her adult sons, giving her the use of the house and garden of the home place for life, without cost, and by which she was to and has since received $500 per annum, (a fair equivalent for her dower, had it then been assigned,) it was *held*, that on a bill for partition, the elder sons, who continued in the use and possession of the farm, were estopped from setting up any such claim on her part to exclude an infant heir from being allowed his just share of the rents and profits in the home farm. Even the widow herself would be equally so estopped.

2. CONTRIBUTION—*as between tenants in common—for purchase money paid—circumstances in discharge of the liability.* A father died in 1855, the owner in fee of a farm of three hundred acres, and holding under a contract of purchase another tract of three hundred and twenty acres, owing on the same about $3200, which was afterwards paid by the eldest son, who took charge of both tracts, and by his labor, and that of his other elder brothers, and the profits derived from the use of the lands, paid the purchase money, and took a conveyance of the latter tract to the widow and heirs of his deceased father. On bill for partition, the eldest son claimed that he ought to be reimbursed by the other heirs for their proportionate share of the purchase money so paid by him after his father's death. It appeared that by a settlement he had made with the adult heirs in 1870, he had treated the money so paid as the product of the joint labor of the family and the profits of the two farms: *Held,* that the claim was properly disallowed.

3. REFERENCE TO THE MASTER—*when not necessary.* In decreeing a partition of lands, and an account of the rents and profits against the heirs who had the use of the same, in a case involving no complicated question of facts or contrariety of evidence, the court found the respective interests of the parties, and as against an infant heir the eldest son should be allowed a certain proportion of all taxes, and for all permanent improvements made by him after a certain date, excluding the value of timber and materials taken from the place, and that the infant heir should be allowed his proportion of the rents and profits of the estate from the same date, fixed at $1000 per annum, after deducting the widow's dower interest, etc. It also appeared that the

adult heirs had practically settled the question of the annual rental of the premises. It was objected that the reference to the master to state the account should have left him to find the rental value, as well as to strike the balance of the account: *Held,* that under the circumstances there was no error in not referring the whole matter to the master.

4. CROSS-BILL—*whether necessary.* On bill for the partition of lands there is no error in requiring an account of the rents and profits to be taken in favor of an infant defendant without a cross-bill being filed by him. Being a minor defendant, he is entitled to the protection of the court without a cross-bill.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of McLean county; the Hon. OWEN T. REEVES, Judge, presiding.

Mr. THOMAS F. TIPTON, for the appellant:

The widow was entitled to the entire home farm until dower was assigned. *Strawn* v. *Strawn*, 50 Ill. 256; *Trask* v. *Baxter*, 48 id. 406.

John Gilmore, the appellant, claims that the $3500 paid by him for the Downs farm, and interest, should be paid him by Ephraim and Mary Gilmore, and Albert Shaver,—in other words, that the shares of these parties should each bear their proportionate share of the payment on the Downs land, and for improvements. *Illinois Land and Loan Co.* v. *Bonner*, 75 Ill. 317.

Commonly, where one co-tenant removes a burden upon the land, all should contribute proportionately to the expense, and where taxes are rightfully paid by only one of the co-tenants, unless reason to the contrary is shown. 47 Ill. 120; *Coster* v. *Stookey*, 89 id. 280.

Such party should also, on like payment of insurance, be allowed for the same. See *Mahoney* v. *Mahoney*, 65 Ill. 406, for statement of the rule; *Roberts* v. *Beckwith*, 79 id. 246.

As to right of Mary Gilmore to dower, if any, for the Downs land, see 70 Ill. 591.

The cause should have been referred to the master to state the account, but instead thereof, the court, as in the case of

*Quayle* v. *Guild*, 83 Ill. 555, proceeded to and did state the account. This was clearly error. *Moss* v. *McCall*, 75 Ill. 196.

Mr. ROBERT E. PORTER, for the appellees:

Appellant having failed to set up his claim as lessee of his mother in his cross-bill, is not entitled to affirmative relief in decree. *McConnell* v. *Smith*, 23 Ill. 611; *Mason* v. *McGirr*, 28 id. 322; *Follansbee* v. *Scottish American Mortgage Co.* 7 Bradw. 486; *Purdee* v. *Henslee*, 97 Ill. 389; *White* v. *White*, 103 id. 438.

It is only long and tedious or disputed accounts that should be referred to the master. The court having heard all the evidence found, and it is amply shown by the record that the rental value was $1500 per annum, the only thing remaining was to find what was due for improvements, taxes, and the like, and that was properly referred to the master. *Patten* v. *Patten*, 75 Ill. 446.

There was no error in decreeing what sum of the rents should be paid to Albert Shaver. He is a minor, and courts of equity are bound to guard the interests of minors, without a prayer therefor. *Hartman* v. *Hartman*, 59 Ill. 103; *White* v. *Glover*, id. 459; *King* v. *King*, 15 id. 487; *Bonner* v. *Peterson*, 44 id. 253; *Smith* v. *Sackett*, 5 Gilm. 534.

Under the Dower act of 1845, (secs. 17, 18 and 19,) it was the duty of the dowress to demand an assignment of dower, and she was entitled to no damages until demanded, (*Strawn* v. *Strawn*, 50 Ill. 256; *Bonner* v. *Peterson*, 44 Ill. 253,) and neither the minor nor his guardian could assign it. *Bonner* v. *Peterson*, 44 Ill. 253.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

This appeal brings before us for review a judgment of the Appellate Court for the Third District, affirming a decree of the circuit court of McLean county, in a partition proceeding between the heirs at law of Nathaniel Gilmore, who died

intestate on the 22d of November, 1855, leaving him surviving Mary Gilmore, (his widow,) and the following children, namely, John, Craig, Eliza J., Albert, William, Ephraim, Mary Ann, and Johnson, being his only heirs at law. Mary Ann and Johnson both died when quite young, without issue,—the former in 1857, and the latter in 1861. Eliza J. intermarried with Alexander Shaver, in 1865, and died in 1867, leaving as fruit of the marriage Albert Shaver, an infant son and only heir.

Nathaniel Gilmore, at the time of his death, was the owner in fee of a farm in Empire township, consisting of three hundred acres, and known as the "Empire farm." He also held, under a contract of purchase, another farm in Downs township, consisting of three hundred and twenty acres, known as the "Downs farm," on which but little, if any part, of the principal of the purchase money had been paid. The balance then due on account of the purchase of this farm amounted to about $3200, which was subsequently paid by the older children out of the profits of the two farms, and upon such payment it was conveyed to the widow and heirs. The Empire farm constituted the residence and homestead of Gilmore at the time of his death, and the widow and children continued to occupy it as such after his decease. The bill in this case was filed by Ephraim Gilmore, against the widow, John Gilmore and Albert Shaver, for the partition of these farms and assignment of dower, the other heirs having transferred their interests therein to John, as hereinafter stated. John Gilmore, claiming to have certain equities as against complainant and Albert, on account of payment of taxes and expenses incurred in making permanent improvements on the farms, filed a cross-bill. This claim was in part allowed by the decree, but not to the extent claimed, and the complainant in the cross-bill brings this appeal.

There is no controversy about the controlling facts in this case. There is some contrariety, it is true, as to the minor

details, but that is all.  The evidence shows that upon the death of Gilmore the family continued to live together on the homestead, as they had before, all working together for the common interest, and deriving their support from their labor and rents and profits of the two farms.  Between 1855 and 1865 the indebtedness on account of the Downs farm was all paid off, and extensive and valuable improvements were made on both farms, all of which expenditures and improvements were made out of the common fund.  Up to this period, or thereabouts, all the accumulations from their joint labor and the proceeds of the farms seem to have been expended in the manner just stated, though the evidence on this point is not very clear.  In 1865, Eliza Jane, having married Shaver, left the farm and ceased to be a member of the family, and consequently ceased to contribute anything to the common fund.  Ephraim, the complainant, at this time could not have been more than self-sustaining, he being then only about fourteen years of age.  John, as the oldest of the boys, had general control of affairs from the death of his father up to 1870, when there was a general settlement between himself, William, Albert, and Craig.  In the meantime, after having paid the purchase money on the Downs land, and opened up and improved the two farms, as above stated, the surplus of the accumulations of the farms was used by the four oldest boys in extending their general business and farming operations, and finally vested by them in the purchase of sixteen hundred acres of valuable land in Ford county, which they divided between themselves.

At the general settlement between them in 1870, just referred to, an account was taken of the property then on hand, and each of the four oldest boys was allowed $20 a month for his time and labor from the day he became of age to the date of settlement, but nothing for his services before that time.  The Ford county·lands were divided between Albert, Craig and William, in consideration of which the latter con-

veyed their interests in the Downs and Empire farms to John. As a part of this settlement it was understood that the widow was to have the house and garden of the home place for life, without cost, and was to receive, in lieu of her dower in the two farms, $500 per annum, to be paid by John, in consideration of which he was to have three-ninths of the two places during the widow's life, and the remaining six-ninths were to be held and enjoyed by John, Ephraim, and Albert Shaver, according to their respective interests in the fee,—and this settlement was agreed to, and has since been carried out, by the widow. This adjustment was made upon the basis that Ephraim and Shaver, respectively, had one-sixth interest in the two farms. In 1880 there was a settlement between Ephraim and his four older brothers, with respect to services, and for the use of his interest during his minority, in the two farms, in which he was allowed and paid by them $1000. The evidence clearly shows the rental value of the two farms was fully $1500 per annum, and it was, in effect, rated at that in the settlement of 1870, by fixing the widow's compensation in lieu of dower at $500 *per annum.* Between 1870 and 1880 Ephraim cultivated his part of the land in question, which, as already appears, was estimated during the widow's life at one-ninth of the whole, or one-sixth of what remained after allowing for her dower. So much of the farms as he cultivated in excess of this he paid rent for to John. In all these arrangements no notice seems to have been taken of the fact that the widow was owner in fee of a small part of this property as heir of the two children who died in infancy, after the decease of their father, and the widow appears to have fully concurred in all that was done. It also appears, from the testimony, that the mother of Albert Shaver, in 1865, received, on account of her interest in the farms, altogether $650.

The court found the interests of the parties in the two farms to be as follows : John $\frac{22}{32}$ parts, Ephraim and Albert

Shaver, respectively, $\frac{5}{32}$ parts, widow $\frac{2}{32}$ parts and dower in the residue, and thereupon appointed commissioners to assign dower and make partition accordingly.   The court also found "that, as against Albert Shaver, John Gilmore should be allowed $\frac{5}{32}$ of all taxes, and for all permanent improvements on said farms made after March 30, 1865, excluding value of timber and materials taken from the place, and that Albert Shaver should be allowed his proportion of the rents and profits of the estate from March 30, 1865, hereby fixed at $1000 per annum, after deducting the widow's dower interest; that Albert Shaver should be charged with $650, paid his mother, in 1865, by John Gilmore; that Ephraim Gilmore should be charged with permanent improvements made after 1870, less timber taken from the farm to make the same." The cause was thereupon referred to a special master, to state an account in conformity with the findings and decree of the court, as above set forth.

Numerous reasons have been assigned why the judgment in this case should be reversed, but we find no merit in any of them.   It is claimed, in the first place, that inasmuch as the widow's dower had never been set off to her, she was entitled to the possession and use of the whole of the home place so long as it remained unassigned, from which the conclusion is reached that Shaver is not entitled to any allowance for rents and profits on account of his interest in the home place. That such is the statute is conceded, and had the widow, in 1870, insisted on this right, instead of acquiescing in the arrangement then made for her by her children, as she did, by which she was to receive, and has annually since then received, what would have been a fair equivalent for her dower had it been then assigned, and if she were here now still insisting on that right, instead of her son, who was a party to that arrangement, the point would doubtless be well taken. But no such a case is presented here.   Under the facts before us even the widow would be estopped from making such

a defence, and that John can not be heard to make it is too palpable to receive serious consideration. The widow, prior to 1870, practically turned over the two farms to the older sons,—not that they might enrich themselves at the expense or to the impoverishment of her minor son and grand-son, but doubtless for the common interest of all. There is not the slightest ground for the claim that she ever intended her dower rights should be used as a source of profit by some of her children to the exclusion of the others. Indeed, no such claim is made. Between 1864 and 1870, the older boys, having full control of these farms, did an extensive and prosperous business, in which they accumulated large sums of money, and profitably invested the same in valuable lands, which they divided between themselves to the exclusion of the minor children, as we have already seen. As to Ephraim, they settled his claim at the moderate sum of $1000, and by the present decree all they are required to do by way of compensating Albert Shaver, is, after charging him with his due proportion of taxes, insurance, and expenses for permanent improvements, to allow him a reasonable rental for the use of his interest in the farms during the time they were making so profitable a use of them. This, we think, he was clearly entitled to.

It is also claimed that John should be reimbursed by the other heirs for their proportionate share of the purchase money paid on the Downs farm after Gilmore's death. As already shown, this money did not belong to John any more than it did to the other members of the family who assisted in earning it. It was the product of the joint labor of the family and the profits of the two farms, and that all parties so considered it, is shown by the fact the deed for the farm was taken in the name of the widow and heirs. Moreover, by the adjustment in 1870 it was so treated. If John had had any just claim on that score, then would have been a very opportune time to have raised the question. It is too late now.

It is objected the case should have been referred to the master to state the account. This was done. Perhaps the real ground of counsel's complaint is, that the rental value of the farms was not left open to be fixed by the master. This was not necessary, under the facts in this case. There was no complication of facts or contrariety of evidence requiring this question to be passed on by the master. As already shown, the parties themselves had practically settled this question, and upon the evidence the court was fully justified in adopting their settlement of it.

The point is made that Shaver, to entitle him to the relief granted, should have filed a cross-bill. This was not necessary. (*Stark* v. *Brown,* 101 Ill. 395.) Being a minor defendant, he was entitled to the protection of the court without a cross-bill. We regard the decree, so far as the appellant is concerned, fully as favorable as he had any right to expect or the law would permit.

The judgment will be affirmed.

*Judgment affirmed.*